IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Criminal Action No. 04-cr-00282-WYD

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. ISMAEL GONZALES-ARENAS,
   a/k/a Jorge Castillo,

    Defendant.

---

**FINDINGS AND ORDER FOR PRE-TRIAL MEDICAL,
PSYCHIATRIC AND PSYCHOLOGICAL TREATMENT TO
RESTORE THE DEFENDANT TO COMPETENCY**

---

The Court has considered the request by the Government for an order pursuant to 18 U.S.C. § 4241(d) authorizing and directing the medical, psychiatric, and psychological staff of the United States Bureau of Prisons at the U.S. Medical Center for Federal Prisoners ("MCFP") at Springfield, MO, to administer a course of treatment on Defendant. This treatment will include administration of a course of anti-psychotic drugs, on a voluntary basis where the defendant cooperates and on an involuntary basis if the defendant does not cooperate, for the purpose of restoring the defendant to competency.

The Court conducted a hearing with the parties in open court on October 28, 2008, to address issues of the defendant's competency, restoration to competency, and court-ordered administration of medication to restore competency. The Government presented by video link the testimony of Robert G. Sarrazin, M.D., who was qualified as

an expert in forensic psychiatry. Dr. Sarrazin provided a written report, was subject to direct examination by the Government and was cross examined by the defense. The Government also called Lea Ann Preston Baecht, Ph.D. Dr. Preston Baecht was qualified as an expert in forensic psychology. Dr. Preston Baecht provided a written report, was subject to direct examination by the Government, and was cross-examined by the defense. Dr. Sarrazin and Dr. Preston Baecht had contact with the defendant during the several months between April 3, 2008, and August 1, 2008, which the defendant spent at the Federal Bureau of Prisons, U.S. Medical Center for Federal Prisoners, in Springfield, MO. The defense called Jeremiah Dwyer, Ph.D. Dr. Dwyer was qualified as an expert in forensic psychology. Dr. Dwyer was examined by the defense and questioned by the Court.

I am familiar with the facts in this case and find and conclude as follows:

Under the legal framework provided by 18 U.S.C. § 4241(d), *Washington v. Harper*, 494 U.S. 210, 221-22 (1990) and *Riggins v. Nevada*, 504 U.S. 127, 133-34 (1992), the Court may order involuntary administration of anti-psychotic drugs to render a mentally ill defendant competent to stand trial on serious criminal charges if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the trial's fairness, and, taking account of less intrusive alternatives, is necessary to further important Government trial-related interests. *Sell v. United States*, 539 U.S.166, 179 (2003); *see also United States v. Morrison*, 415 F.3d 1180, 1181 (10th Cir. 2005).

*Sell* notes, however, that "ordinarily" a court should not engage in the above analysis unless it has first considered whether it is appropriate to medicate the

defendant to ensure the defendant's safety or the safety of others. *Id.* at 183. In an earlier opinion, the Supreme Court held that it is permissible to administer antipsychotic drugs involuntarily to a prison inmate with a serious mental illness "if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Washington*, 494 U.S. at 227. "Thus, a court need not consider whether to allow forced medication for the purpose of rendering the defendant competent to stand trial if forced medication is warranted for a *different* purpose, such as the purposes set out in *Harper* related to the individual's dangerousness, or purposes related to the individual's own interests where refusal to take drugs puts his health gravely at risk." *Sell*, 539 U.S. at 181-82 (emphasis in original).

In the case at hand, I have considered whether medication could be administered involuntarily on one of these alternative grounds. There was no testimony or evidence that supports a finding that the defendant should be medicated on the ground that he is dangerous or that his refusal to take drugs puts his health gravely at risk. Drs. Sarrazin and Preston Baecht opined that the defendant was not dangerous within the prison setting. They further considered whether medication was appropriate because the defendant was gravely disabled, but found that he did not meet that criteria. Accordingly, I find that no alternative grounds have been presented that would allow the involuntary administration of medication to the defendant.

Thus, I turn to whether medication should be administered involuntarily to the defendant in an effort to restore competency. By a preponderance of the evidence, I find that the defendant suffers from a delusionary disorder which renders him incompetent to stand trial at this time, and that there is no reasonable likelihood that the

defendant will be restored to competency without the administration of medication.  I further find by a preponderance of the evidence that there is a substantial likelihood the defendant's mental condition will improve if he undergoes a course of treatment involving anti-psychotic medication administered under the supervision of the medical and professional staff at the U.S. Medical Center for Federal Prisoners.

In so finding, I have considered carefully the legal standards and elements required to support an order requiring the administration of medication to restore a defendant to competency as set forth in *Sell*, 539 U.S. at 177-83.  As to the first factor, "a court must find that *important* governmental interests are at stake." *Id.* at 180 (emphasis in original).  Courts must, however, "consider the facts of the individual case in evaluating the Government's interest in prosecution." *Id.*  "Special circumstances may lessen the importance of that interest." *Id.*

I find and conclude as to the first factor that important Government interests are at stake.  The defendant is accused of serious crimes.[1]  He is a prior convicted felon, who the Government asserts was convicted three times before the offenses at issue, and is also an illegal alien and unregistered sex offender.  According to the Government, the defendant was previously convicted in state court of operating a crack house within 1000 feet of a public school and went right back to doing this while on

---

[1] Specifically, Defendant is charged with possessing a firearm after having been convicted of a crime, knowingly maintaining a place for the purpose of storing, distributing and/or using quantities of a substance containing cocaine, knowingly conspiring and agreeing with another person to possess with intent to distribute more than 50 grams of a mixture and substance containing cocaine base, knowingly possessing with intent to distribute a quantity of a mixture and substance containing cocaine base while at a location within 1000 feet of a public school, knowingly possessing a firearm in furtherance of a felony drug trafficking crime, and knowingly entering and remaining in the United States as an alien after having previously been convicted of a felony.

probation, resulting in the charge in this case. The Government also asserts that the defendant was convicted of sexual assault of his daughter in state court. Based on the foregoing, I find that the Government has a very strong interest in restoring Defendant to competency and seeing that Defendant is prosecuted for the offenses at issue.

While Defendant has already been incarcerated for over four (4) years, a substantial amount of time, if Defendant is found guilty of the charges, the advisory guideline range would likely result in a much more lengthy period of incarceration. Indeed, defense counsel acknowledges that if Defendant is convicted of the charges at issue, he would likely be subject to a sentence of life without parole. Further, it is questionable that the civil commitment proceedings would apply to Defendant absent a criminal trial, given the testimony of Dr. Preston Baecht that he is an illegal alien and that commitment proceedings are often not initiated as to such defendants. Accordingly, I find that the importance of the Government's interest is strong and is not reduced to any real extent by any specific circumstances in this case. I further find that, if necessary, the involuntary medication to restore the defendant to competency will significantly further the Government interests served by bringing the defendant to trial.

Second, I find that the administration of medication is substantially likely to render the defendant competent to stand trial. *Sell*, 539 U.S. at 181. I also find and conclude that administration of medication under the supervision of the medical and professional staff at the Medical Center "is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Id*. I base this finding on the testimony and reports of both Dr. Sarrazin and Dr. Preston Baecht which support these findings.

While there was testimony of potential side effects with the medication recommended by Drs. Sarrazin and Preston Baecht, Dr. Sarrazin opined that these could most likely be alleviated through dosage or medication changes or through other medications. Further, he opined that the risk of any serious side effects was minimal, only a one to two percent risk.

Third, I conclude that involuntary medication is necessary in this case and in so doing, have considered whether alternative, less intrusive treatments could achieve substantially the same results. *Sell*, 539 U.S. at 181. Both Drs. Preston Baecht and Sarrazin opined that there were no alternative, less intrusive methods that could likely restore Defendant to custody. I find their testimony to be credible. I also have considered and attempted to implement the least intrusive means for administering the drugs. *Id*.

Fourth, "'the court must conclude that administration of the drugs is *medically appropriate*, i.e., in the patient's best medical interest in light of his medical condition.'" *Id*. (emphasis in original). Again, I find that this factor is satisfied based on the testimony of Drs. Preston Baecht and Sarrazin. Both doctors testified, consistent with their reports, that administration of anti-psychotic drugs is medically appropriate as to the defendant and in the defendant's best medical interest in light of his medical testimony. I do not find anything in Dr. Dwyer's testimony that substantially conflicts with that testimony.

Based upon the foregoing, I find that the *Sell* factors have been satisfied and that administration of anti-psychotic medication (on a voluntary or an involuntary basis as described below in the treatment plan) is appropriate in an attempt to restore the

defendant to competency. Accordingly, the defendant will be committed to the custody of the Attorney General to be transported and housed at the U.S. Medical Center for Federal Prisoners (MCFP) located at Springfield, MO. The Court orders and authorizes a course of treatment to include involuntary medication of the defendant to the extent necessary in the professional judgment of the supervising physicians and professional staff. If, at any point in the course of treatment the medical and professional staff members determine that any aspect of the present order gives rise to any unsound medical treatment, said staff members are directed to convey any related concerns or requests for change in this order to the Court on a forthwith basis.

The period of treatment by the administration of involuntary medication authorized by this order shall begin after the defendant's arrival at the U.S. Medical Center for Federal Prisoners (MCFP) at Springfield, MO, and shall continue for a period of four months, unless the medical and professional staff determine that the defendant has been restored to competency before the end of the four month period. If, during the treatment, it appears to the medical and professional staff that more time is required to restore the defendant to competency, said staff members are directed to so advise the Court before the end of the fourth month of treatment under this Order.

It is the intention of the Court to provide the medical and professional staff with enough flexibility so that said staff may exercise its best professional judgment in treating the defendant. It is also the intention of the Court to provide the defendant with opportunities to cooperate with the ordered course of treatment to minimize the percentage of medication administered on an involuntary basis.

Accordingly, the Court hereby authorizes and orders the following treatment plan for Ismael Gonzales-Arenas, a/k/a Jorge Castillo:

1. Mr. Gonzales-Arenas will first be presented with a copy of the court order authorizing involuntary treatment with antipsychotic medications. The treating psychiatrist will attempt to enlist Mr. Gonzales-Arenas's cooperation by engaging in a discussion of the available options of taking oral antipsychotic medications on a daily basis at the lowest effective dose. The recommended oral medication's would include aripriprazole (Abilify) at target doses of 15 mg - 60 mg daily; Geoden at target doses of 80 mg - 320 mg daily; risperidone (Risperdal) at target doses of 2 mg - 60 mg daily; and haloperidol (Haldol) at target doses of 2 mg 20 mg daily. Mr. Gonzales-Arenas will be informed of the requirement to cooperate with nursing staff, with accepting oral medication daily at pill line. He will be informed of the requirement to fully cooperate with all requests by the nursing staff to perform a "mouth check" which is a brief visual inspection of the patient's mouth after accepting the medication. The purpose of the mouth check is to lower the risk of a patient "cheeking" his medications at pill line by concealing the medication tablet(s) in his mouth and then spitting the medication out later. Mr. Gonzales-Arenas will also be informed of the requirement to cooperate with all periodic laboratory tests to measure his serum concentration of the prescribed antipsychotic medication if this is so ordered. This would provide additional data regarding his compliance and metabolic rate and potentially assist with future dosing adjustments. As long as Mr. Gonzales-Arenas would be willing to cooperate with these requirements, the treating psychiatrist would prescribe one

or more trials of any one of these oral medications in a flexible manner as mutually agreed with Mr. Gonzales-Arenas. Trials of aviprioprazole or Geadon would be recommended as the initial treatment given their somewhat more favorable overall side effect profile.  Due to somewhat higher risks of metabolic side effects, a trial of olanzapine would not be recommended unless trials with aripriprazole were ineffective or not well tolerated.  The goal is to achieve clinical improvement at the lowest effective dose starting at the low end of the dosing range and gradually increasing the dose as clinically indicated.  If Mr. Gonzalez-Arenas develops intolerable side effects to any one of the medications that is not amenable to dosage adjustment or addition of adjunctive medication, the treatment regimen would be switched to another of the antipsychotic medications listed above.

2. In the event Mr. Gonzales-Arenas refuses to accept the recommended treatment of oral antipsychotic medications after he has received a copy of the court order and has been offered an opportunity to discuss the above issues with the treating psychiatrist, treatment would be initiated with injections of shorter term and, if necessary in the judgment of the medical staff, long acting antipsychotic medications as described below. Correctional policies would be followed if restraints are necessary for the nursing staff to safely administer medication injections to Mr. Gonzalez-Arenas.  After the administration of shorter term antipsychotic medications by injection, the defendant would be given an opportunity to comply with the order by taking oral medications.  If the defendant refuses to cooperate by taking the oral medications as directed, the medical staff

is authorized, ordered and directed to administer long acting antipsychotic medication by injection. Again, correctional policies would be followed if restraints are necessary for the nursing staff to safely administer medication injections to Mr. Gonzales-Arenas.

3. In the event treatment with injections of long acting antipsychotic medication is necessary as described above, Mr. Gonzales-Arenas will receive a test dose of haloperidol 5 mg administrated by intramuscular injection if he refuses to ingest this medication orally. The purpose of the test dose is to identify any rare idiosyncratic reactions to this medication. If this medication is well tolerated, the following day he will receive an injection of haloperidol decanoate. This dose would initially be repeated in two weeks with subsequent dosing adjustments as clinically indicated.

4. If neuromuscular side effects emerge during the treatment with any antipsychotic medication, Mr. Gonzales-Arenas would be offered the lowest effective dose of adjunctive medication to manage these adverse effects. He would be offered benztropine at doses ranging from 0.5 mg to 1 mg two to three times daily as needed if he begins to manifest muscle stiffness or tremor. He would be offered propranolol at a dosage ranging from 10 mg to 40 mg two to three times daily as needed for restlessness. If clinically indicated he would be offered short courses of lorazepam at doses of 0.5 mg to 1 mg two to three times daily as needed for short term treatment of neuromuscular side effects that do not respond to other adjunctive treatments. If Mr. Gonzales-Arenas's neuromuscular side effects

persist despite adjunctive treatment, then he will be offered treatment with alternative antipsychotic medications.

5. If Mr. Gonzales-Arenas becomes agitated or combative during the process of receiving an injection, he may receive an injection of lorazepam 2 mg to assist with calming him down so that he can safely release from restraints in a shorter period of time. An injection of benztropine 1 mg may be given in conjunction with injection of short acting haloperidol to prevent the emergence of extrapyramidal side effects.

6. During the trial of any antipsychotic medication Mr. Gonzales-Arena's would be monitored for possible development of diabetes or possible emergence of elevated serum lipids using the standard protocol at MCFP Springfield which includes monthly weights, monthly measurements of fasting glucose and measurements of serum lipids every three months.

7. For the purpose of monitoring and managing any metabolic side effects, Mr. Gonzales-Arenas is ordered to cooperate with medical, psychological, nursing and laboratory staff. If he refuses to cooperate with such recommendations the staff shall attempt to educate him on the rationale for these interventions or forms of treatment. If Mr. Gonzales-Arenas persists in his refusal to cooperate during the proposed treatment, the protocol would be enforced involuntarily at approximately 90 day intervals. Through such protocols, the defendant's weight will be measured and laboratory test specimens will be safely collected.

Not later than during the first week of the fourth month of treatment pursuant to this order, the principal treating physician or the principal treating psychologist, or both, shall prepare a report for the Court outlining the defendant's status or progress and indicating whether in their professional judgment an enlargement of time is necessary for the defendant's treatment through the administration of antipsychotic medication.

The defendant is hereby committed to the custody of the Attorney General and shall be transported to the MCFP at Springfield, MO, for the course of treatment outlined above. 18 U.S.C. § 4241(d).

IT IS SO ORDERED.

Dated: November 26, 2008

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge